IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel., CHERI SUTER and | ) | Case Nos, CV-03-015-S-BLW |
| MELINDA HARMER, | ) | CV-03-128-S-BLW |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM** |
| | ) | **DECISION AND ORDER** |
| v. | ) | |
| | ) | |
| NATIONAL REHAB PARTNERS INC. | ) | |
| and MAGIC VALLEY REGIONAL | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it Defendant Magic Valley's Motion for Summary

Judgment (Docket No. 125), Plaintiffs' Motion for Partial Summary Judgment

(Docket No. 127), Defendant Magic Valley Regional Medical Center's Motion for

Summary Judgment or Summary Adjudication (Docket No. 129), Defendant Magic

Valley Regional Medical Center's Motion to Strike Plaintiffs' Expert Witness

Ronald H. Clark (Docket No. 130), Defendant Magic Valley Regional Medical

Center's Motion to Strike Relators' Expert Witness Leslie Mack (Docket No, 131),

National Rehab Partners Inc.'s Joinder in Motion to Strike Plaintiffs' Expert

Witness Ronald H. Clark (Docket No. 133), National Rehab Partners Inc.'s Joinder in Motion to Strike Plaintiffs' Expert Witness Leslie Mack (Docket No. 134), and National Rehab Partners Inc.'s Joinder in Motion for Summary Judgment (Docket No. 135). The Court heard oral argument on the motions on March 5, 2009, and now issues the following decision.

## ANALYSIS

### I. Summary Judgment Standard of Review

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving

party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e).

## II.    MVRMC's Motion for Summary Judgment (Counts I and VI in Case No. CV-03-128-S-BLW)

Defendant MVRMC asserts that Counts I and VI of Plaintiffs' Complaint are barred by the applicable statute of limitations. Plaintiffs concede the motion with respect to Count VI for other reasons. Accordingly, the Court will grant summary judgment in favor of MVRMC on that claim, and the Court will address MVRMC's motion only as it applies to Count I.

In Count I, Plaintiffs assert a retaliation claim under the Federal False Claims Act ("FCA") pursuant to 31 U.S.C. § 3730(h), alleging that they were terminated because they complained about MVRMC's alleged noncompliance with Medicare regulations. The FCA does not contain an express statute of limitations for Section 3730(h). *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409 (2005). In fact, the Supreme Court has determined that the six-year limitations period referenced in Section 3731(b) does not apply to retaliation claims brought under Section 3730(h). *Id.* For that reason, this Court must borrow a limitations period from the most closely analogous state statute. Id. at 422; *North Star Steel Co. v. Thomas*, 515 U.S. 29, 33-34 (1995).

Thus, in order to ascertain the limitations period applicable to Plaintiffs' FCA claim under 3730(h) in this case, this Court must determine the most closely analogous Idaho state statute. *Graham County* gives us the appropriate statute. In

*Graham County*, the Supreme Court listed the likely analogous statutes for each of the fifty states. *Id*. at 419 n.3. For section 3730(h) claims filed in Idaho, the Supreme Court indicated that Idaho Code § 6-2105 or § 5-2243 would be the most likely applicable statutes to consider when borrowing a limitations period for a section 3730(h) claim. *Id.* Of these two statutory provisions, the Court finds that the Idaho Protection of Public Employees Act ("IPPEA") is the more analogous state statute. Of particular significance in this case is Plaintiffs' Complaint, where Plaintiffs initially asserted causes of action under both the IPPEA and FCA. In the Complaint, Plaintiffs pled almost identical facts under the two claims – improper record keeping and improper billing practices – which relate to both the IPPEA and the FCA.

Applying the analogous IPPEA limitations period, the Court must look to Idaho Code § 6-2101, which establishes "a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." I.C. § 6-2101. Section 6-2103(1) provides that "'[a]dverse action' means to discharge. . . ." Section 6-2105, which establishes the IPPEA's limitations period, provides that: "[a]n employee who alleges a violation of this chapter may bring a civil action for appropriate injunctive relief or actual damages, or both, within one hundred eighty

(180) days after the occurrence of that alleged violation of this chapter."

Therefore, the 180-day limitations period likewise applies to an FCA retaliation

claim in Idaho.

In this case, Plaintiffs' cause of action could have accrued for purposes of

their FCA claim no later than March 28, 2001 – the date MVRMC terminated

Plaintiffs.  However, Plaintiffs did not file their FCA claim until March 27, 2003,

almost two years later.  Thus, Plaintiffs' FCA claim was filed beyond the

limitations period.

Still, Plaintiffs suggest that the IPPEA limitations period does not apply

because they were not public employees under the IPPEA.  In support of their

argument, Plaintiffs suggest that the breadth of the IPPEA's protections covers

employers enrolled in PERSI.  This construction of the statute is out of line with

the plain language of the statute, which broadly defines employer to include any

"political subdivision or governmental entity *eligible* to participate in the public

employees retirement system, chapter 13, title 59, Idaho Code." I.C. § 6-2103(4)(a)

(Italicized emphasis added).  In Idaho, "[w]here the language of a statute is clear

and unambiguous, statutory construction is unnecessary, and this Court need only

determine the application of the words to the facts of the case at hand. . . . The

interpretation of a statute should begin with an examination of the literal words of

the statute, and this language should be given its plain, obvious, and rational meaning." *Jen-Rath Co. v. Kit Manufacturing Co.*, 48 P.3d 659, 664 (Idaho 2002) (Citations omitted). Plaintiffs' misreading of the statute would turn the fundamental public policy interests of the IPPEA on their heads and cut-off whistleblower protections to a class of employees who work for public entities simply because the entities elected not to enroll in PERSI. There is no support for such an argument.

Moreover, it is clear that MVRMC was eligible for PERSI enrollment. This is true notwithstanding MVRMC's contention that, as a county owned hospital, MVRMC was only eligible to enroll in PERSI if the county itself was enrolled. Idaho Code § 59-1321 establishes the process for non-enrolled political subdivisions to become enrolled in PERSI, and nothing in those enrollment procedures indicates that the county's own enrollment is an eligibility prerequisite for a county-owned political subdivision. Thus, statutory enrollment procedures do not support county enrollment as a prerequisite for a political subdivision's PERSI eligibility. Accordingly, as a political subdivision at the time of Plaintiffs' employment, MVRMC was eligible to enroll in PERSI. MVRMC was therefore a public employer as defined by the IPPEA and the 180-day limitations period of the IPPEA applies. The Court will therefore grant summary judgment in favor of

MVRMC on Count I.

**II.     Motion to Strike Expert Witness Leslie Mack**

Plaintiffs retained Leslie Mack as an expert to review the physical therapy records of patients who received treatment at MVRMC's Transitional Care Unit ("TCU") and to determine whether the hospital delivered physical therapy services in accordance with Medicare requirements. Specifically, Plaintiffs retained Mack to determine whether TCU patients received individualized therapy or group therapy, whether group therapy exceeded Medicare's limits, and whether unlicensed therapy aides were used improperly.

The familiar standard, under Rule 702 of the Federal Rules of Evidence and *Daubert*, requires that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  To satisfy the requirements of Rule 702: (1) an expert's opinion must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the expert must have applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; see also *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).

MVRMC argues that Mack's opinions should be excluded for the following

reasons: (1) her opinions are based on insufficient data; (2) she did not use a reliable methodology in selecting the documents she reviewed; (3) she did not use a proper methodology for an audit of Medicare reimbursements; and (4) she is not qualified to audit patient records for compliance with requirements for Medicare reimbursements.  The Court will address each argument below.

A.    **Sufficient Facts or Data**

MVRMC contends that Mack's opinion is inadmissible because it is not based on sufficient facts or data. However, Mack states that she relied on the actual physical therapy records of each patient as well as the testimony of the therapists. (Abbott Decl. Ex. G, Mack August 28, 2008 Tr. at 175:2-9; 218:25-219:9; 2008 Report at p. 3). Additionally, Plaintiffs explain that Mack reviewed all physical therapy documentation provided to them by MVRMC in response to the discovery request for all records documenting therapy, which were the only documentation in the patient medical records describing when and how the hospital delivered physical therapy at the TCU.

Moreover, MVRMC's allegation of apparent time conflicts in therapy sessions is not evidence that Mack relied on insufficient facts and data.  Instead, such information may be used on cross-examination.  Thus, because Mack relied on all information in the patients' official medical records relating to the hospital's

delivery of physical therapy, MVRMC's argument that Mack relied on insufficient facts or data fails.

### B. Selecting Documents for Review

MVRMC next argues that Mack's testimony should be excluded because Plaintiffs' attorneys selected the documents for her review.  However, as pointed out by Plaintiffs, the nature of the evidence relied upon by an expert goes more to the weight of her testimony – an issue which may be explored during cross-examination. *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir 2004) (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir.2004).

Still, MVRMC is correct that if counsel improperly provides an expert with a biased subset of documents that may so skew her opinion that it becomes inadmissible under Rule 702.  *Rowe Entm't Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *2 (S.D.N.Y. 2003); *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 233-234 (S.D.N.Y. 2004).  In *William Morris*, the plaintiffs' expert concluded that black concert promoters were underutilized by the defendant booking agencies due to race discrimination. *William Morris*, 2003 WL 22124991, at *2. The court excluded the expert because the plaintiffs had provided the expert with contracts only involving white promoters, predetermining

the expert's conclusion. *Id*. at *3.

Here, unlike the situation confronted by the court in *William Morris*, MVRMC makes no specific allegation as to how counsel provided Mack with a biased subset of documents; only that the documents were provided by counsel, and that Mack should have been provided with more documents.  MVRMC's mere belief that Mack should have considered additional evidence does not establish bias or insufficiency.  Without specific details as to how Mack's consideration of a limited subset of the available documents skewed her conclusions or otherwise affected the reliability of her opinion, as was provided  by the defendant in *William Morris*, the Court cannot find that Mack's opinion should be barred under Rule 702.

### C.     Methodology for Audit/Review of Medicare Reimbursements

MVRMC also contends that Mack's opinions are not the product of a reliable methodology. Plaintiffs counter that, in developing her opinions, Mack used the simplest and most comprehensive methodology available by reviewing every document related to physical therapy.

To satisfy Rule 702, an expert's opinion must be the product of reliable principles and methods.  Fed. R. Evid. 702; see also *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).  Plaintiffs suggest that

Mack's method was grounded in the review of the most pertinent documents possible – the patient's physical therapy records produced by MVRMC in response to Plaintiffs' request for production of "[a]ll records documenting therapy." (Abbott Decl. Ex. G, Mack August 28, 2008 Tr. at 174:23-175:9; 218:25-219:16). Mack then reviewed the nature and frequency of the exercises performed, the therapist notes and evaluations, and the times therapy was recorded as having occurred and who performed it. (Abbott Decl., Ex. C, 2005 Report at 2, 8, 9-10); Ex. G, Mack August 28, 2008 Tr. at 226:18-24; 227-23:228:11). She then developed a method to chart the information on the Daily Flow Sheets to look for a pattern of group therapy sessions. (Id. at 107:13-19).

Mack ultimately opines that MVRMC's practices violated Medicare's limits on group therapy because multiple patients were routinely seen at 9:00 a.m. and 1:00 p.m., patients received the similar amounts of treatment time, little documentation existed showing patient monitoring during therapy sessions or individualized attention, and treatments consisted of routine exercises and were similar between patients regardless of their condition, diagnoses, or progress. The Court concludes that Mack's methodology is sufficient to support her conclusions.

### D.    Qualified to Give Expert Opinion

Finally, MVRMC argues that Mack's opinion is inadmissible because she is

not qualified to review physical therapy patient records for compliance with Medicare requirements. "A witness can qualify as an expert through practical experience in a particular field, not just through academic training." *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991). As noted by Plaintiffs, it is undisputed that Mack has extensive knowledge of, and experience with, Medicare's requirements for the performance of physical therapy services. It is also undisputed that Mack has experience supervising therapy and reviewing medical records to determine whether patients received individualized therapy or group therapy. It is also clear that she has done chart reviews to determine whether documentation meets Medicare requirements. (Abbott Decl. Ex. G, Mack August 28, 2008 Tr. at 96:17-25).

Based on the foregoing, the Court finds that Mack is qualified to render an opinion and testify as to the manner in which the hospital delivered physical therapy services in this case. Accordingly, the Court will deny MVRMC's motion to strike.

## III. MVRMC's Motion for Summary Judgment or Summary Adjudication (Counts I-VI in CV-03-015-S-BLW)

As a preliminary matter regarding MVRMC's Motion for Summary Judgment or Summary Adjudication, the Court notes that Plaintiffs have conceded Counts I and II, as well as all claims tied to the dates between July and September

1998.  Accordingly, the Court will grant summary judgment in favor of MRVMC on those claims.

With respect to the remaining claims, a Plaintiff in an FCA action must prove the following elements: "(1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false." *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001). Additionally, the Ninth Circuit incorporates a materiality element. *U.S. v. Bourseau*, 531 F.3d 1159, 1170 (9th Cir. 2008).

### A.    False or Fraudulent Claim

Plaintiffs allege that MVRMC submitted false claims to Medicare by improperly seeking reimbursement for therapy that did not comply with the Group Therapy and Line of Sight Guidance.  MVRMC takes issue with what it calls non-binding Medicare guidance.

The Centers for Medicare and Medicaid Services issues manuals which instruct Medicare and the Medicare Fiscal Intermediary about Medicare regulations. These manuals do not, in and of themselves, have the effect of statutes and regulations.  *Nat'l Med. Enters. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988). However, courts have allowed non-binding guidance to predicate FCA liability in

cases where the non-binding guidance merely interprets specific language in an existing statute or regulation. Thus, the relevant inquiry is whether the manuals articulate interpretive or legislative rules.

On the one hand, an agency rule is interpretative if the agency "is exercising its rule-making power to clarify an existing statute or regulation[.]" *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 350 (D.Conn. 2004) (quoting *Metro. School Dist. v. Davila*, 969 F.2d 485, 488 (7th Cir. 1992)). On the other hand, legislative rules "create new law, rights, or duties. . . ." *Id*. at 350 (quoting *Davila*, 969 F.2d at 488). Medicare manual rules have consistently been considered interpretive rules. *Id*. at 351 (quoting *St. Mary's Hosp. v. Blue Cross & Blue Shield Ass'n*, 788 F.2d 888, 891 (2d Cir. 1986)). Accordingly, "there have been numerous cases imposing FCA liability . . . based on violations of Medicare manual provisions." *Id*. at 351-52.

Here, the Medicare Provider Reimbursement Manual, sections 2831-37, fall under the heading "Skilled Nursing Facility Prospective Payment System." Section 2831 states that it "also provides operational instructions and further clarification of the applicable rules contained in 42 CFR 413 Subpart J." Subpart J codifies the Medicare Perspective Payment System regulations, including its rate methodology, and the requirement for skilled nursing facilities to submit resident assessment data

for administering that methodology. See 42 C.F.R. §§ 413.337 & 413.343.  Section

483.20 describes the clinical assessment tool known as the Minimum Data Set,

which allocates patients into Resource Utilization Groups ("RUGs") based on

minutes of therapy.

Section 2837 of the Medicare Provider Reimbursement Manuel states the

following with respect to which minutes may be counted in the Minimum Data Set:

"[M]inutes of therapy provided by at least one supervising therapist (or therapy

assistant) within a group of 4 or fewer participants, may be fully counted, provided

that those minutes account for no more than 25 percent of the patient's weekly as

reported in Section P of the [Minimum Data Set]." (Squyres Decl. Ex. 16,

Medicare Provider Reimbursement Manual, § 2837 (July 1998)).  Thus, Section

2837 further clarifies the rehabilitative therapy reporting requirements of the

Minimum Data Set.  It is therefore an interpretative rule.

With respect to the Federal Register preamble, Plaintiffs suggest that it

interprets 42 C.F.R. §§ 409.30-.31 and 424.20. Section 409.30 states that

posthospital skilled nursing facility care is covered if a patient is "assigned to one

of the Resource Utilization Groups that is designated . . . as representing the

required level of care." 42 C.F.R. § 409.30. Pursuant to 42 C.F.R. § 424.20,

Medicare pays for posthospital skilled nursing facility care if the individual "has

been correctly assigned to one of the Resource Utilization Groups[.]" 42 C.F.R. § 424.20. Plaintiffs' theory rests on the preamble's interpretation of how to assign a patient to a correct RUG based on the minutes of therapy required.

Plaintiffs also note that 42 C.F.R. §409.31(a)(2) and (3) define covered rehabilitation services as those provided by a physical therapist if "furnished directly by, or under the supervision of, such personnel." 42 C.F.R. §409.31(a)(2) and (3). In such a case, Plaintiffs rely on the preamble interpretation that therapy aides can provide therapy, which can be counted for RUG assignment purposes, but with certain limitations. For example, the preamble interprets the direct supervision requirement of 42 C.F.R. §409.31(a)(3) to mean that the therapist must have "visual contact with the aide at all times" and adds that aides "must never be responsible" for group therapy. 64 Fed. Reg. 41,661. Accordingly, this language may form the basis for FCA liability. Thus, as explained in *Cardiac Devices*, "[t]o adopt defendants' position that interpretive rules are not binding would effectively nullify the Medicare manuals in their entirety and would allow defendants to submit claims for any and all types of non-covered services that clearly were not reasonable or necessary." *Cardiac Devices*, 221 F.R.D. at 353.

MVRMC also suggests that because Section 2837 does not have the effect of law, it is not binding on the Provider Reimbursement Review Board. However, as

explained above, Section 2837 constitutes an interpretive rule which may bind

Medicare providers and form the basis for FCA liability. MVRMC's argument is

therefore unpersuasive.

Finally, MVRMC contends that the only potential evidence that any patients

received group therapy, or therapy by an unsupervised aide, is the testimony of

Plaintiffs' expert, Leslie Mack. In turn, MVRMC argues that because Mack is

unqualified to give an expert opinion, Plaintiffs' claims fail for lack of evidence.

As explained above, Mack is qualified to give her expert opinion. Therefore,

MVRMC's final argument fails as well.

### B.    Presented or Caused to be Presented to Government for Payment

The second element of an FCA claim is satisfied if a person "knowingly

presents, or causes to be presented, a false or fraudulent claim [to the United

States] for payment or approval." 31 U.S.C. § 3729(a)(1) (1994). Here, Plaintiffs'

claims are based on the UB-92s which were submitted to the government with the

purpose and effect of obtaining payment. There is really no dispute that these

forms were submitted to the Government for payment. The real dispute relates to

falsity, as addressed above, and knowledge and materiality as addressed below.

### C.    Knowledge that the Claim was False

"The FCA defines 'knowing' and 'knowingly' to mean that, with respect to

information, a person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *U.S. v. Bourseau*, 531 F.3d 1159, 1167 (9th Cir. 2008) (Internal quotations omitted); 31 U.S.C. § 3729(b). "[N]o proof of specific intent to defraud is required." *Id*. (Quoting 31 U.S.C. § 3729(b)). "The requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence." *Id*. (Internal citation and quotation omitted).

MVRMC offers two reasons why it did not knowingly present false claims for payment: (1) it was not reckless in hiring and relying on Rehability or NRP to provide appropriate therapy services and document those services accurately to support its claims to Medicare; and (2) the underlying Group Therapy Guidance is inherently ambiguous.

MVRMC relies heavily on *U.S. ex rel. Ervin & Associates, Inc. v. Hamilton Security Group, Inc.*, 298 F.Supp.2d 91 (D.D.C. 2004) in asserting that it is not liable because it relied on Rehability and NRP to provide appropriate therapy services and document those services accurately.  In *Hamilton*, HUD awarded Hamilton Security Group a contract to dispose of several billion dollars in HUD-held mortgage notes through public auctions. *Hamilton*, 298 F.Supp.2d at 93.

Hamilton Security Group subcontracted with Bell Laboratories, a nationally known

scientific research company, to develop a computer model to select the

combination of bids to maximize revenue to HUD. *Id*. at 93-94. Bell Laboratories

made a small mathematical error, which Hamilton Security Group did not catch.

Among other reasons, but of relevance here, the court in *Hamilton*

determined that Hamilton Security Group's conduct was not so reckless as to

conclude that it had knowingly made a false claim to the Government.

Specifically, the court determined that "Hamilton did not represent that it would

specifically test the results of the optimization process to verify that it had indeed

yielded the 'optimal' result." *Id*. at 101. Therefore, "it was . . . not negligent in the

extreme, if negligent at all, for Hamilton to rely on an organization like Bell Labs .

. . ." *Id*. The court also observed that Hamilton, "due to the complexity of the

pioneer, massive, and time-sensitive note sale transaction, subcontracted the work

of developing an optimization formula to a prestigious scientific laboratory. . . ."

*Id*. The court ultimately concluded that Hamilton Security Group's failure to

create a system better attuned to the possibility of error did not constitute reckless

disregard within the meaning of the False Claims Act. *Id*. at 102.

Here, the claims are not like the complex, massive, and time-sensitive note

sale transaction in *Hamilton*. Instead, this case involves fairly straight-forward

claims.  Moreover, Plaintiffs' claims suggest that MVRMC's  employees understood the group therapy rules, knew they weren't being followed, but submitted false claims anyway.  Plaintiffs also provide the Court with evidence of MVRMC employees' understanding of the regulations and personal knowledge of the therapy provided by Rehability and NRP therapists.  Finally, it is significant that the *Hamilton* court made its determination following a bench trial after all the evidence had been presented.  Given these distinctions, the conclusion in  *Hamilton* seems largely inapposite to the facts presented here.  The Court concludes that a genuine issue of material fact exists with respect to whether, by relying on Rehability and NRP, MVRMC acted in deliberate ignorance, or in reckless disregard of the truth or falsity, of the information. *Bourseau*, 531 F.3d at 1167.

MVRMC's second argument – that it is not subject to FCA liability because group therapy is inherently ambiguous – is also unpersuasive.  MVRMC contends that because group therapy has no standardized definition, MVRMC cannot have knowingly violated group therapy provisions.  The scant case law on this issue suggests that whether a defendant reasonably interpreted the regulation is a relevant inquiry.  The Eighth Circuit, citing a Ninth Circuit case, has rejected the contention that a defendant cannot be held to have made a false statement by verifying compliance with an ambiguous regulation, if the defendant's verification

was consistent with a possible interpretation of the regulation. *Minnesota Ass'n of Nurse Anesthetists v. Allina Health*, 276 F.3d 1032, 1052 (8th Cir. 2002) (citing *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 460, 463 (9th Cir.1999). In *Oliver*, the Ninth Circuit suggested that the reasonableness of one's interpretation of an applicable regulation or standard is relevant to whether it knowingly submitted a false claim. *Oliver*, 195 F.3d at 463. However, as suggested by the Eighth Circuit in *Allina*, if a plaintiff shows that a defendant certified compliance with a regulation knowing that the regulating agency interpreted the regulation in a certain way and that their actions did not satisfy the requirements of the regulation as interpreted by the agency, any possible ambiguity of the regulations is moot. *Allina*, 276 F.3d at 1052.

Here, Plaintiffs have provided the Court with evidence suggesting that MVRMC understood that therapy was classified as either individual or group. Moreover, Plaintiffs have provided the Court with evidence that the Medicare Provider Reimbursement Manuals indicated that the Government would only pay for a maximum of 25% group therapy, leaving a requirement that at least 75% be individual therapy. (Squyres Decl. Ex. 16, Medicare Provider Reimbursement Manual, § 2837 (July 1998)). Moreover, Section 2837 also limited groups to no more than four patients. (Id.)

Under these circumstances, the Court finds that genuine issues of material fact remain as to the question of whether MVRMC acted reasonably in its interpretation of the group therapy regulation, and whether MVRMC certified compliance with a regulation knowing that the agency interpreted the regulation in a way that would render MVRMC's actions as not satisfying the requirements of the regulation as interpreted by the agency. These questions are therefore better left to the jury.

### D.    Materiality

MVRMC also contends that Plaintiffs cannot establish their FCA claim because they cannot show that MVRMC submitted Medicare claims for more than it was entitled. It is an "obvious notion that a False Claims Act suit ought to require a false claim." *U.S. v. Kitsap Physicians Service*, 314 F.3d 995, 997 (9th Cir. 2002). To prove a FCA claim, a plaintiff "must establish that a false claim was submitted to the government." *Id*. at 1002. It is not enough "to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted." *Id*. (Internal quotation and citation omitted). Instead, the plaintiff "must show an actual false claim for payment being made to the Government." *Id*. (Internal quotation and citation omitted). Still, a plaintiff "may recover under the False

Claims Act regardless of whether it suffered damage – recovery is based solely upon proof that false claims were made." *Id.* (Internal quotation and citation omitted). Ultimately, the FCA "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme." *Id.*

As noted above, the Ninth Circuit incorporates a materiality element into FCA claims. *U.S. v. Bourseau*, 531 F.3d 1159, 1170 (9th Cir. 2008). "The Supreme Court has stated that [i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 1171 (Internal citation and quotations omitted). Finding that it is more consistent with the plain meaning of the FCA, the Ninth Circuit has adopted the Fourth and Sixth Circuits' "'natural tendency test' for materiality, which focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered." *Id.*

In this case, Plaintiffs allege that MVRMC submitted false UB-92 forms for the purpose and effect of obtaining payment. The argument is that RUG groups have a natural tendency to cause Medicare to pay amounts claimed on the UB-92s and there was no other basis for those payments to have been sought or made.

MVRMC suggests that even if therapy minutes are removed from the Minimum Data Set, the RUG score *may remain unchanged*. That also means, however, that it also *may change* the RUG score, which would, in turn, change the reimbursement amount.

The complexity of the Medicare Perspective Payment System makes it difficult to comprehensively evaluate how adjustments in therapy minutes affect the RUG score and reimbursement amount in every situation. However, the Court finds the following example provided by Plaintiffs persuasive in creating at least a genuine issue of material fact as to whether MVRMC submitted false RUG scores which had a natural tendency to cause Medicare to pay amounts claimed on the UB-92s:

> Therapy times were entered on Daily Flow Sheets under the heading "Treatment Times/Billing." SOF ¶ 38. The resulting minutes were entered in Section P of the MDS, which determined qualification for the RUG. The RUG group generated was then recorded on the UB- 92, which is the claim for payment. Thus, to determine if the UB-92 was a false claim because the patient did not qualify for the RUG group, the next step is to determine how many minutes included in the MDS are derived from group therapy minutes that cannot be counted.
>
> The case of patient Dora A. illustrates how counting excessive group therapy minutes resulted in a false claim (the minutes for all 17 patients are examined at SOF ¶ 56). Dora A.'s first MDS assessment placed her in the Very High RUG group, which requires at least 500

minutes of therapy over a five-day period per week. Section P of her five-day MDS assessment included 365 minutes of physical therapy and 209 minutes of occupational therapy over a period of five days, for a total of 574 minutes. However, comparing her Daily Flow Sheets to others who received therapy on the same five days reveals that she received therapy in groups 100% of the time, and that six of ten therapy sessions were in groups larger than four patients. Id. Thus none of her physical therapy minutes could be counted under PRM § 2837. Only the 209 minutes of occupational therapy could be counted, leaving her almost 300 minutes shy of the minutes needed to qualify for the Very High RUG group. Nonetheless, MVRMC used all of the physical therapy minutes to qualify her for payment at the Very High RUGs group on form UB-92. SOF ¶ 56. MVRMC was reimbursed by Medicare at the RVB per diem rate for the first seven days of her stay. This same pattern is repeated for all but a few Rehabilitation RUG patients over the two year period. SOF ¶¶ 44-45.

(Plaintiffs' Response In Opposition To MVRMC's Motion For Summary Judgment Or Summary Adjudication, pp. 17-18 (Docket No. 145)).[1]  The Court therefore concludes that there is sufficient documentary evidence creating a genuine issue of material fact.

_____

[1] The Court notes that it did not simply rely on the Statement of Facts provided by Plaintiffs for support of this example case.  Instead the Court reviewed the actual documents and testimony referenced in the Statement of Facts to ensure that it was as described by Plaintiffs. Those documents and testimony include the following: Squyres Decl. Ex. 23 (Example Daily Flow Sheet); Squyres Decl. Ex. 38. (Patient Daily Flow Sheets, RUGS Rehab Worksheets and MDS forms); Squyres Decl. Ex. 5 (Burdick Testimony, May 24, 2005, Tr. at 185:7–187:9); Squyres Decl. Ex. 32 (Cover sheet and Daily Flow Sheets for 17 TCU patients during the week of March 28-April 3, 2000); Squyres Decl. Ex. 33 (Leslie Mack's charts for the week of March 28-April 3, 2000).

**E.    Public Disclosure**

MVRMC argues that the Court lacks jurisdiction over Plaintiff Harmer's claims under the FCA's public disclosure bar.  The analysis under the public disclosure provision of the FCA is divided into two steps. In the first step,

> the court must determine whether, at the time the complaint was filed, there has been a "public disclosure" of the "allegations or transactions" on which the claim is based. If the allegations or transactions were not publicly disclosed, the court has subject matter jurisdiction even if the relator was not the original source of the information.

*Seal 1 v. Seal A*, 255 F.3d 1154, 1159 (9th Cir. 2001) (citing 31 U.S.C. § 3730(e)(4)(A)).  The second step applies when the allegations or transactions were publicly disclosed.  In that case, "the relator may bring the suit only if she was 'an original source of the information.'" *Id*. (quoting 31 U.S.C. § 3730(e)(4)(A)).

MVRMC asserts that Harmer's allegations were publicly disclosed when Ellen Neff and Cherri Suter disclosed the alleged facts supporting the claims in this case to an Idaho Medicaid Fraud Unit for investigation. The FCA defines a public disclosure to include, among other things, "a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation. . . ." *United States ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 917 (9th Cir. 2006); *see also Seal 1*, 255 F.3d at 1159.  "[T]he term 'investigation, as used in § 3730(e)(4)(A), must encompass any kind of government investigation – civil, criminal, administrative,

or any other kind." *Seal 1*, 255 F.3d at 1161. This includes "non-federal . . . investigations." *Bly-Magee v. Premo*, 470 F.3d at 918.

Plaintiffs do not dispute that Neff and Suter disclosed the information to Medicare Fraud Investigator Mond Warren on June 21, 2001. Instead, Plaintiffs suggest that because Warren was a government official and did nothing more than pass the information onto the Office of the Inspector General and the Medicare Fiscal Intermediary, the disclosure was not a public one.

The Ninth Circuit has "previously indicated that a government employee to whom information relevant to an FCA action is disclosed is not a member of the public under" Section 3730(e)(4)(A). *Seal 1*, 255 F.3d at 1161. The disclosure in this case falls directly within that scenario. Therefore, the allegations or transactions were not publicly disclosed, and the Court has subject matter jurisdiction even if Plaintiff Harmer was not the original source of the information. *Seal 1*, 255 F.3d at 1159 (citing 31 U.S.C. § 3730(e)(4)(A)).

## IV. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment on their claims against MVRMC for unjust enrichment and conversion. In these two claims, Plaintiffs essentially assert that MVRMC was unjustly enriched by taking control of Plaintiffs' business, Cornerstone Therapy, and converting it to its own use.

## A.    Unjust Enrichment

In Idaho, a party may recover for unjust enrichment "where a defendant receives a benefit which would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust." *Vanderford Co. v. Knudson*, 165 P.3d 261, 271-72 (Idaho 2007) (citations omitted).  There are three elements necessary to establish a prima facie case of unjust enrichment: "(1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Id*. at 272.

Plaintiffs contend that it is undisputed that the first element was satisfied when MVRMC acquired Cornerstone at the time Suter and Harmer became hospital employees on October 1, 2000. However, competing evidence suggests that MVRMC did not acquire Cornerstone, and that Plaintiffs never stopped operating Cornerstone.  MVRMC has offered evidence that Plaintiffs continued to service at least one significant Cornerstone contract and retained the proceeds in a private bank account under their exclusive control.  (Anderson Aff., Ex. B, Suter Depo. p. 417:15-17, 425:21-427:22; Anderson Aff., Ex. A, Harmer Depo. pp. 107:19-108:14, 111;13-21; Anderson Aff., Ex. C).  Moreover, MVRMC offers

evidence that, following their terminations from MVRMC, Plaintiffs continued to exercise legal control over Cornerstone by filing an annual report and Articles of Dissolution stating "change of name and location of business" as the sole purpose for Cornerstone's dissolution. (Anderson Aff., Exs. D & E).

Based on the evidence before the Court, there are genuine issues of material fact as to whether MVRMC acquired Cornerstone and received a benefit conferred upon it by Plaintiffs. Accordingly, summary judgment on Plaintiffs' unjust enrichment claim will be denied.

## B.    Conversion

Conversion is defined as "a distinct act of dominion wrongfully asserted over another's personal property in denial [of] or inconsistent with [the] rights therein." *Luzar v. Western Sur. Co.*, 692 P.2d 337, 340 (Idaho 1984) (Internal citation omitted). Plaintiffs argue that MVRMC committed the tort of conversion when it refused to pay Harmer and Suter the money owed to them from the Cornerstone acquisition, while retaining the benefit conferred on it by the acquisition.

As explained above with regard to the unjust enrichment claim, disputed issues of material fact exist as to whether MVRMC acquired Cornerstone. Those same disputed issues of fact prevent summary judgment on Plaintiffs' conversion

claim because they prevent a finding on whether MVRMC committed a distinct act of dominion wrongfully asserted over Cornerstone. *Luzar*, 692 P.2d at 340. Accordingly, the Court will deny Plaintiffs' motion.

## V.     Motion to Strike Expert Witness Ronald Clark

The Court has determined that Ronald Clark's testimony does not affect the pending motions for summary judgment.  Moreover, the Court believes that a *Daubert* hearing may be necessary and appropriate before issuing a decision on whether, and to what extent, Mr. Clark may testify a trial.  Accordingly, the Court will deem moot the pending motion to strike Mr. Clark as an expert witness. However, MVRMC may renew the motion, and the parties may request a *Daubert* hearing, at a later date prior to trial.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendant Magic Valley's Motion for Summary Judgment (Docket No. 125) shall be, and the same is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 127) shall be, and the same is hereby DENIED.

IT IS FURTHER ORDERED that Defendant Magic Valley Regional Medical Center's Motion for Summary Judgment or Summary Adjudication

(Docket No. 129) shall be, and the same is hereby GRANTED in part and DENIED in part. The motion is granted with respect to Counts I and II, as well as all claims tied to the dates between July and September 1998. The motion is denied with respect to all other claims.

IT IS FURTHER ORDERED that Defendant Magic Valley Regional Medical Center's Motion to Strike Plaintiffs' Expert Witness Ronald H. Clark (Docket No. 130) shall be, and the same is hereby DEEMED MOOT.

IT IS FURTHER ORDERED that Defendant Magic Valley Regional Medical Center's Motion to Strike Relators' Expert Witness Leslie Mack (Docket No, 131) shall be, and the same is hereby, DENIED.

IT IS FURTHER ORDERED that National Rehab Partners Inc.'s Joinder in Motion to Strike Plaintiffs' Expert Witness Ronald H. Clark (Docket No. 133) shall be, and the same is hereby, DEEMED MOOT.

IT IS FURTHER ORDERED that National Rehab Partners Inc.'s Joinder in Motion to Strike Plaintiffs' Expert Witness Leslie Mack (Docket No. 134) shall be, and the same is hereby, DENIED.

IT IS FURTHER ORDERED that National Rehab Partners Inc.'s Joinder in Motion for Summary Judgment (Docket No. 135) shall be, and the same is hereby, Granted in part and DENIED in part in the same manner as MVRMC's Motion for

Summary Judgment (Docket No. 129).

IT IS FURTHER ORDERED that the Clerk of the Court shall set this matter

for a status conference for the purpose of scheduling a trial date.

DATED:  **September 24, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge